FILED
2013 Jul-25  PM 04:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | )**Case No.: 2:11-cr-0424-CLS-MHH** |
| | ) |
| **ARTAVIS DESMOND MCGOWAN,** | ) |
| *also known as* | ) |
| **"Tav"** | ) |

### TRIAL MEMORANDUM

Comes now the United States of America by and through its counsel, Joyce White Vance, United States Attorney for the Northern District of Alabama and Gregory R. Dimler and William R. Chambers, Jr., Assistant United States Attorneys, and files this Trial Memorandum to assist the Court in preparing for trial and to identify issues that may require particular attention during the course of the trial.

### Charges

Count One of the indictment charges the defendant with conspiracy to distribute and to possess with the intent to distribute five kilograms or more of cocaine hydrochloride, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and (b)(1)(A).  The charge alleges that the conspiracy occurred from in or about August 2011, and continued until on or about October 5, 2011.  The

1

charge includes co-defendant DONALDO FIGUEROA CRUZ as well as alleging that the defendant conspired with others "known and unknown to the Grand Jury."

Stemming from events that took place on or about October 5, 2011, the defendant is also charged with possession with the intent to distribute 500 grams or more of cocaine hydrochloride (Count Two) and twenty-eight grams or more of cocaine base ("crack" cocaine), 100 grams or more of heroin, and an amount of marijuana (Count Four).

The indictment also contains a notice of the government's intent to seek an order of forfeiture in the form of a money judgment.  In criminal forfeiture cases, the proceedings are bifurcated, and the asset forfeiture allegation is not raised during the guilt phase of the trial.  The asset forfeiture is presented to the jury in a separate proceeding upon a finding of guilt.  Often, the parties merely argue the asset forfeiture allegation and the Court then instructs the jury on the standard they are to apply in determining whether there will be an order of forfeiture and, if so, in what amount.  The government anticipates that this will be the process in the case if the defendant is found guilty, although there may be a need to call a limited number of additional witnesses during this second proceeding.

<u>Summary of Facts to be Adduced at Trial</u>

The government summarizes the anticipated evidence to be presented during its case-in-chief as follows:

DEA agents in Austin, Texas received information from a reliable confidential source, who had acted as a drug courier for an Austin-based drug trafficking organization, that multiple loads of cocaine and heroin were being delivered to the Birmingham area in several different "load" vehicles. The source provided detailed descriptions regarding the trips, including details of who he/she would meet with, where these meetings would take place, and the length of time involved in the transactions. The source also gave detailed descriptions of the load vehicles and other vehicles used by the organization. The source provided a detailed description of a green Volkswagen Jetta that the source explained was used by organization members to meet up with load cars. He/she also described a gray Lexus that he/she had driven from Austin to Birmingham. The source explained that he/she was in this vehicle when pulled over by the Texas Department of Public Safety for which he/she received a citation. Based upon this information, DEA agents found a record of the stop, confirming the information provided by the source. Through these records, they learned the tag number of the vehicle.

3

Austin DEA agents passed the information provided by the CS to allow Birmingham agents to locate the vehicle. The green Jetta was found several days later. On September 20, 2011, while the Jetta was parked in a public parking lot for an apartment complex, DEA agents placed a self-powered GPS tracking device on the undercarriage of the Jetta.

Over the course of several days, agents followed the Jetta using the GPS device and actual physical surveillance. On October 4, 2011, after monitoring the GPS device, DEA agents located the Jetta (unoccupied at the time) in a Wal-Mart parking lot in Homewood, Alabama. During physical surveillance at the Wal-Mart, agents saw, for the first time, a heavy-set Hispanic male, who they later learned was co-defendant Donaldo Figueroa Cruz. Agents followed Figueroa throughout the store and watched as he purchased multiple boxes of Food Saver vacuum seal bags. This heightened the agents suspicion since Food Saver vacuum sealers are a commonly used drug and currency packaging mechanism. Agents followed Figueroa as he left the Wal-Mart, got into the Jetta, and drove to an Auto Zone store in Hoover, Alabama. He was later followed to a Habanero's restaurant, and ultimately, the same apartment complex in Hoover, Alabama, where the GPS was originally installed, and where agents later learned Figueroa was living.

4

The next day, while monitoring the GPS device, DEA agents learned that the Jetta had moved to the Howard Johnson hotel on Oxmoor Road in Homewood. Agents traveled to the hotel where they saw the green Jetta parked outside of a room. They also saw a 2001 gray Lexus parked outside the hotel room. This Lexus matched the description and had the same tag number as the "load" vehicle identified by the source in Austin, Texas. Later, agents saw Figueroa – whose identity was not yet confirmed – leave the hotel and travel to the same apartment building where he was staying in Hoover. After a short time, agents saw Figueroa leave the apartment building with a box full of supplies and return to the Howard Johnson hotel and enter the hotel room. Shortly thereafter, Figueroa left in the gray Lexus. Two Hispanic males – who were unidentified at the time – were seen leaving the hotel and getting into the green Jetta. The men were followed to a local restaurant after which surveillance on the Jetta ended.

DEA agents followed Figueroa, who was driving the same grey Lexus that had been identified earlier in the investigation as possible drug "load" vehicle, to a home located at 1156 Skyline Drive in Birmingham, Alabama. Figueroa arrived at the home and parked in front of the garage. Due to difficulty in maintaining physical surveillance, agents were not able to sit directly in front of the home without being spotted. During one of several drive-by surveillance efforts, agents

saw that the Lexus was no longer in front of the garage.  Since all avenues of ingress and egress from the home were under constant surveillance and agents had not seen the Lexus depart, agents concluded that the car had been pulled into the garage.  Agents watched the house for hours; they saw numerous individuals and vehicles come and go.  At one point, agents observed a white Toyota FJ Cruiser arrive at the home.  One of the agents identified an occupant of the vehicle to be James Harris.  A traffic stop was performed on Harris and he was positively identified.  Surveillance was maintained on Harris as agents watched him switch vehicles, get into a tan Chevrolet Avalanche and head back to 1156 Skyline Drive.

Another vehicle that arrived at 1156 Skyline Drive was a black Jeep that was later determined to be driven by the defendant Artavis McGowan.  Later, he was seen leaving the house in a black Jeep with two black males.

Believing that drug evidence was likely inside the home, agents feared that the black Jeep might contain drugs.  Accordingly, DEA agents on the scene directed Jefferson County Sheriff's Deputy Michael Schuelly to attempt to perform a traffic stop on the vehicle to identify its occupants.  In accordance with the orders he had been given, Deputy Schuelly clocked the vehicle as it passed his location.  The Deputy estimated the car was traveling at 15 miles per hour over the posted speed limit.  After pulling out, Deputy Schuelly found the Jeep, which was being

tailed by a DEA agent, and after passing several cars, got behind the Jeep.  While Deputy Schuelly was tailing the car, he clocked its rate of travel at over 50 miles per hour in a 35 mile per hour zone.  Accordingly, he initiated lights and sirens pulling the vehicle over.

Upon approaching the passenger window of the vehicle, Deputy Schuelly smelled a strong odor of raw marijuana.  As part of the traffic stop, he asked for identification from each of its three occupants.   The driver was identified as Artavis Desmond McGowan.  One of the other two men identified himself as Traniel Golden.  The other man, later identified as Biniam Ashgedom, provided a fictitious name.  A records check on Traniel Golden caused deputies to suspect that his actual name was Traniel Clark, which was confirmed by one of the vehicles occupants.

While deputies were still working to confirm the identity of Traniel Clark, Deputy Schuelly asked Artavis McGowan to exit the vehicle and speak with him. The conversation that ensued, which was captured on Deputy Schuelly's patrol car video, clearly shows McGowan offering to allow deputies to search the vehicle. Initially, Deputy Schuelly does not take McGowan up on the offer, however, several minutes later, after speaking with DEA agents, Deputy Schuelly advises McGowan that he would like to search the Jeep, to which McGowan responds, "no

problem."  Additionally, the video makes clear that McGowan was not in custody at the time, with Deputy Schuelly telling him there is no need to put his hands on the car and be searched.

While the traffic stop was underway, agents with the DEA were preparing a State of Alabama search warrant to be presented to a Jefferson County Circuit Court Judge.  Agents at the scene of the search were radioing information to agents preparing the warrant.  At a point at which it appeared that there was no additional reason to continue the traffic stop, Special Agent Sean Stephen with the DEA gave the order to enter the home on Skyline Drive and secure the residence to ensure that its occupants were not tipped off regarding the stop of McGowan by law enforcement, which might lead to flight or to the destruction of evidence. Accordingly, agents entered the home and secured its only occupant, Donaldo Figueroa, who was found in the basement of the home where the garage is located in the process of concealing $110,000 in cash in a hidden compartment of the Lexus.  Figueroa had just unpacked approximately 5 kilos of cocaine from the same compartment where agents could see it in plain view on the kitchen counter. Figueroa was placed under arrest and the scene was secured while agents waited on the search warrant to be signed by the Judge.

8

After obtaining consent from McGowan, the Jeep was searched. The search resulted in the recovery of a Food Saver box and over $4,000 in cash. A large bundle of cash was found in the center console of the vehicle. A black briefcase in the back seat contained more cash, and the vehicles occupants together had nearly $9,000 on their person. This information was relayed to TFA Gentry, who added a paragraph to that effect to the search warrant.

Thereafter, agents at the house radioed the scene of the traffic stop advising that large amounts of cocaine were seen at the home. Accordingly, McGowan and his companions were detained and brought back to the house.

DEA agents commenced the search of the house when TFA Gentry notified them that the search warrant had been signed. Upon executing the search warrant, in the garage of the home, agents discovered the grey Lexus that Figueroa had driven there earlier that day. The rear bumper of the Lexus was removed exposing two compartments where narcotics and money could be secreted. On the passenger seat of the car agents found four bundles wrapped in black electrical tape that were later discovered to each contain more than $10,000 of U.S. currency. From a counter top in the basement kitchen of the home, near where Figueroa was apprehended, agents seized six compressed bricks of suspected powder cocaine. From a white garbage bag on the kitchen floor, agents recovered several Food

Saver vacuum seal shrink bags wrapped in black electrical tape and forty-six kilogram sized cocaine wrappers.[1]  From the kitchen area of the basement, agents also recovered approximately 613 grams of suspected heroin and 170 grams of suspected cocaine base.

Agents also discovered a bedroom in the basement.  While searching the top drawer of a dresser in the bedroom, agents found documents and photos associated with Artavis McGowen, including greeting cards addressed to him.   In the basement bedroom closet, agents found a black bag containing four bags of marijuana.  Further into the closet, and behind a sheet rock wall, agents recovered a black backpack containing money packaged in ziplock bags.  And at the foot of the bed, agents found a white bucket with a large sum of cash inside.

Agents also searched the upstairs area of the home, which contained a bedroom and kitchen, among other areas.  From the upstairs bedroom dresser chest, agents seized an amount of U.S. currency, the driver's license of Anthony McGowan, and a loaded Taurus 9mm pistol with one round in the chamber.  Near the bed, agents discovered a safe which contained additional cash.  From the upstairs kitchen area, agents seized a bag containing marijuana.  From the white Acura, registered in the name of Anthony McGowan, which was parked in front of

---

[1]Agents later performed chemical testing on the kilogram sized wrappers confirming the presence of cocaine residue.

the home, agents recovered the lease agreement for 1156 Skyline Drive.  The lease was in the name of his girlfriend, Princess Quintella Floyd, who was also at the house that day.

Throughout the house, agents recovered other amounts of drugs, as well as digital scales and other items of drug paraphernalia, including a Food Saver vacuum seal machine and a money counting machine.  From the house, agents recovered a total of $341,679.

The drugs recovered from the house that day were submitted to the DEA laboratory for testing.  The suspected powder cocaine recovered from basement kitchen counter was confirmed to be cocaine hydrochloride with a net weight of 4,371 grams.  Also from the basement, inside a small black box, agents recovered another smaller quantity of cocaine hydrochloride with a net weight of 23.5 grams and a small quantity of marijuana. The suspected heroin seized from a kitchen cabinet in the basement kitchen was confirmed to be heroin with net weights of 55 and 68.8 grams.  From the basement kitchen freezer, agents recovered suspected ecstasy pills, heroin, and "crack" cocaine.  The substances were confirmed to be ecstasy, heroin (with a net weight of 368.2 grams), and cocaine base (with a net weight of 115.2 grams).  The large amount of marijuana seized from the basement

bedroom, where Artavis McGowan resided, was confirmed to be marijuana with a net weight of 905.3 grams.

<u>Evidentiary and Other Issues</u>

Although the government cannot anticipate all of the evidentiary, procedural, and housekeeping issues which may arise during the course of the trial or all of the objections which may be raised by the defendant, the government hereinafter discusses, with reference to appropriate authority, some of the issues which it does anticipate may require particular rulings by the Court or generally require the Court's attention.

1. *Apprendi and Alleyne*

The United States Supreme in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000) held that any factor which increases the penalty for a crime beyond the prescribed statutory maximum penalty must be submitted to a jury and established with proof beyond a reasonable doubt.  In Counts One, Two and Four, the defendant is charged with offenses that includes a factor which increases the statutory maximum sentence.  The amount of drugs also increases the defendant's statutory minimum sentence, a factor which must be proven to the jury beyond a reasonable doubt.  *Alleyne v. United States*, 133 S. Ct. 2151 (2013).  The Government must prove beyond a reasonable doubt that the defendant conspired to

distribute and possess with the intent to distribute cocaine hydrochloride. Additionally, *Apprendi* and *Alleyne* require that the Government also prove to the jury beyond a reasonable doubt that the conspiracy involved over five kilograms of cocaine hydrochloride in order to establish the charged penalty section, 841(b)(1)(A). In a similar manner, the jury will have to use a special verdict form on Counts Two and Four.

Therefore, the jury will have to find and indicate with a special verdict form the amounts of cocaine hydrochloride, cocaine base, and heroin to be attributed to the defendant.

## 2. Co-conspirator Statements

The government anticipates that the evidence at trial will include up to three witnesses who are unindicted co-conspirators in the case who will testify regarding their knowledge of the events surrounding a conspiracy that involved the two defendants charged in this case, an unindicted co-conspirator whose identity is known to the United States (J.H.), and others. This evidence will include statements made to these witnesses by McGowan, J.H., and others. These statements were made in furtherance of an ongoing conspiracy involving McGowan, J.H., and others. Some of these statements were made after the events of October 5, 2011. The evidence will show that despite McGowan's arrest on

state charges stemming from the events of October 5, 2011, and his ultimate indictment in this case, his involvement in the conspiracy with J.H. and others continued.  These statements made by McGowan and J.H. are admissible as non-hearsay under Federal Rule of Evidence 801(d)(2)(E).

In order for one conspirator's statement to be admissible against other conspirators, the Court must find (1) that a conspiracy existed, (2) that the declarant was a member of the conspiracy, (3) that the defendant was a member of the conspiracy, (4) that the statement was made in furtherance of the conspiracy, and (5) that the statement was made during the course of the conspiracy.  *Bourjaily v. United States*, 483 U.S. 171 (1987).  In considering the admissibility of such statements, the Court may consider, among other things, the statement itself. *Bourjaily*, 483 U.S. at 180-181.  Furthermore, once the Court is satisfied that such a statement is admissible as a co-conspirator's statement, the Court need not address Confrontation Clause issues.  *Bourjaily*, 483 U.S. at 181-183.  *See also United States v. Lampley*, 68 F.3d 1296 (11th Cir. 1995) (co-conspirator statements admissible against defendant who joined conspiracy after statements were made) and *United States v. Archbold-Newball*, 554 F.2d 665 (5th Cir. 1977).

Although the witnesses the Government expects to call were also co-conspirators at the time the statements were made, there is no requirement that the

14

statement be made to a co-conspirator.   The Eleventh Circuit addressed this issue

in *United States v. Thompson*, 976 F.2d 666 (11th Cir. 1992), rejecting the notion

that Rule 801(d)(2)(E) required that a statement be made by a co-conspirator to a

co-conspirator to qualify for admission under the rule, the Court stated:

> For a coconspirator's statement to be admissible
> under Rule 801(d)(2)(E), it need not be made by a
> coconspirator to a coconspirator.  Rather, a conspiracy
> must have existed involving the declarant and the
> defendant, and the statement must have been made
> 'during the course and in furtherance of the
> conspiracy.'

*Thompson*, 976 F.2d at 670, quoting, Fed.R.Evid. 801(d)(2)(E).  See also *United*

*States v. Williamson*, 53 F.3d 1500, 1519 (10th Cir. 1995) (801(d)(2)(E) does not

"embody" a requirement that a statement be made by co-conspirator to co-

conspirator to qualify) and *United States v. Molina*, 75 F.3d 600 (10th Cir. 1996).

In addition, the fact that McGowan was arrested on state charges on October

5, 2011, did not terminate his membership in the conspiracy, nor did the

conspiracy as a whole end.  Indeed, the evidence at trial will show that the

conspiracy continued, its purpose still in full effect and its goals continuing to be

met.  A co-conspirator's arrest does not in itself terminate a conspiracy as a matter

of law, for the conspirators may remain fully capable of carrying out their purpose,

notwithstanding the arrest of one of their cohorts.  *United States v. Richardson*,

532 F.3d 1279, 1286 (11th Cir. 2008); *United States v. Grubb*, 527 F.2d 1107,

1109 (4th Cir. 1975); *United States v. Thompson*, 476 F.2d 1196, 1200-01 (7th

Cir.), cert. denied, 414 U.S. 918, 94 S.Ct. 214, 38 L.Ed.2d 154 (1973); *United

States v. Gonzalez*, 940 F.2d 1413, 1427 (11th Cir. 1991) ("[N]either arrest nor

incarceration automatically triggers withdrawal from a conspiracy."). In *United

States v. Casamayor*, 837 F.2d 1509, 1513 (11th Cir. 1998), the Court held,

> the taped statements of some of the co-defendants,
> obtained with a body bug on a co-conspirator who began
> to cooperate with the Government, were admissible as
> statements made in furtherance of the conspiracy, even
> though some co-conspirators had been arrested.  The
> district court correctly found that this was an on-going
> conspiracy which did not end upon the arrest of some of
> the co-conspirators.  See *United States v. Papia*, 560 F.2d
> 827, 835-37 (7th Cir. 1977).

Among the statements that the Government expects the co-conspirators to

testify to, which were made by McGowan and J.H., detail their efforts to conceal or

"cover up" the events that took place on October 5, 2011, at 1156 Skyline Drive.

These statements are admissible as statements by a co-conspirator made in

furtherance of the conspiracy.  See *United States v. Del Valle*, 587 F.2d 699 (5th

Cir.), cert. denied, 442 U.S. 909, 99 S.Ct. 2822 (1979)(concealment is sometimes a

necessary part of a conspiracy, so that statements made solely to aid concealment

are in fact made during and in furtherance of the charged conspiracy).  Such a

statement need not be necessary to the conspiracy, it must only further the conspiracy. See *United States v. Caraza*, 843 F.2d 432 (11th Cir. 1988). A "liberal standard" is applied in determining whether a statement is made in furtherance of a conspiracy. *United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002). Statements alerting co-conspirators of police activity in hopes of continuing or salvaging the conspiracy are widely recognized as statements in furtherance of a conspiracy. *United States v. Carmichael*, 379 F.Supp.2d 1299, 1302 (M.D.Ala. 2005)(statements to perpetuate conspiracy by warning of police raid admissible as statement of co-conspirator); *United States v. Quinones-Cedeno*, 51 Fed.Appx. 558, 559 (6th Cir.2002) (anonymous note to assist co-conspirator in avoiding detection and warning of law enforcement activity admissible under Rule 801(d)(2)(E)); *United States v. Skidmore*, 254 F.3d 635, 638 (7th Cir.2001) (statements to control damage to or detection of the conspiracy are in furtherance); *United States v. Jackson*, 67 F.3d 1359, 1364 (8th Cir.1995) (statements concerning efforts to avoid police detection of conspiracy admissible pursuant to Rule 801(d)(2)(E) because they "were made pursuant to an attempt to keep the conspiracy going"); *United States v. Garcia*, 893 F.2d 188, 190 (8th Cir.1990) (statements made in effort to delay or prevent coconspirator's arrest were made "in furtherance" of conspiracy).

17

3.  Inextricably Intertwined Evidence

During the trial, the government will introduce evidence of the defendant's involvement in trafficking cocaine, cocaine base and heroin.  The conspiracy that existed in this case involved the trafficking of all three substances, although the conspiracy alleged in Count One charges only cocaine hydrochloride.  Since quantities of cocaine base, heroin and marijuana were all found in the basement area of 1156 Skyline Drive, evidence regarding trafficking in these substances is highly relevant to Counts Two and Four and otherwise admissible under Count One as direct and circumstantial evidence of the defendant's involvement in the charged offenses.  To the extent that any of this evidence is challenged, the government also submits that the evidence is intrinsic evidence as well.

> [e]vidence of criminal activity other than the charged offense is not extrinsic under Rule 404(b) if it is (1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offense, (2) necessary to complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offense.

*United States v. Ramsdale,* 61 F.3d 825, 829 (11th Cir.1995).

> "Evidence, not part of the crime charged but pertaining to the chain of events explaining the context, motive and set-up of the crime, is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of

> the crime, or is necessary to complete the story of the crime for the jury." *United States v. Williford,* 764 F.2d 1493, 1499 (11th Cir.1985).

*United States v. McLean*, 138 F.3d 1398, 1403 (11th Cir. 1998).

The government submits that all of the above-described evidence is properly admissible under this standard as inextricably intertwined or intrinsic evidence.

4.  Chain of Custody

To avoid unnecessary delay and reduce the number of chain of custody witnesses, the United States does not anticipate calling every witness included in the chain of custody with each item of evidence.  The witnesses who will testify in the government's case-in-chief regarding the recovery of evidence will be able to testify as to the chain of custody.  The United States would note, however, that any breaks in the chain of custody merely go to the weight of the evidence rather than to its admissibility.  *See United States v. Roberson*, 897 F.2d 1092 (11th Cir. 1990) and *United States v. Lopez*, 758 F.2d 1517, 1521 (11th Cir.1985), *cert. denied*, 474 U.S. 1054, 106 S.Ct. 789 (1986).

5.    Summary and Pedagogical Devices

The Government's intends to offer a summary exhibit in the form of diagram of telephone contacts between McGowan, Jose Tavera Ugarte (the organization's source of supply), another co-conspirator, and Figueroa.   This

exhibit will be based upon four sets of telephone records.  The summary exhibit was created to assist the jury in reviewing the hundreds of pages of telephone records that include thousands of telephone contacts that would not be relevant to their determination in this case.  The jury could, of course, review the telephone records which will have been admitted in the case should the defense choose to challenge the accuracy of the summary exhibit.

Federal Rule of Evidence 611(a) permits the use of charts and diagrams as summary evidence.  The proponent of the Rule 611(a) chart can use reasonable assumptions or conclusions in creating it.  *See United States v. Richardson*, 233 F.3d 1285, 1293-94 (11th Cir. 2000)(headings reflecting expert's opinions on summary charts permitted); *United States v. Johnson*, 54 F.3d at 1157-59 (organizational chart summarizing witness testimony in light most favorable to government permissible where jury properly instructed and chart maker subject to cross examination); *United States v. Norton,* 867 F.2d 1354, 362-63 (11th Cir. 1989) ("the essential requirement is not that [summary] charts be free from reliance on any assumptions, but that these assumptions be supported by the evidence in the record"); *United States v. Stephens*, 779 F.2d 232, 238-39 (5th Cir. 1985) (use of characterizations in chart permissible if jury properly instructed); *United States v. Bertoli*, 854 F.Supp. at 1056 (assumptions in chart allowed where supported by

20

underlying evidence); *see also United States v. Diez*, 515 F.2d 892, 905 (5th Cir. 1975) (use of descriptive headings in chart).  There is also no requirement that the summary exhibit contain the defendant's version or theory.  *See United States v. Radseck*, 718 F.2d at 239; *United States v. Ambrosiani*, 610 F.2d 658 n.2 (1st Cir. 1979).

There is a danger that assumptions or conclusions implicit in a Rule 611(a) demonstrative exhibit will cause the exhibit to be impermissibly argumentative, misleading, or otherwise unfair.  If assumptions or conclusions are important to the understanding of the exhibit, it is imperative that the exhibit preparer be made available for cross examination. *See, e.g.*, *United States v. Salerno*, 108 F.3d 730, 745 (7th Cir. 1997); *United States v. Paulino*, 935 F.2d at 753; *United States v. Radseck*, 718 F.2d at 239. *See also United States v. Drougas*, 748 F.2d at 25-26 (summary chart admissible after argumentative entries deleted).

With such an instruction, such summary evidence is not only permissible, but also will facilitate the jury's work in this case.

6.   Forfeiture Principles

If the defendant is convicted during the guilt-innocence portion of this case, the Court must move "[a]s soon as practicable . . . to determine what property is subject to forfeiture under the applicable statute."  Fed. R. Crim. P. 32.2(b)(1).

"Upon a party's request in a case" where the finding of guilty is made by a jury, "the jury must determine whether the government has established the requisite nexus between the property and the offense committed by the defendant."  Fed. R. Crim. P. 32.2(b)(4).

In deciding forfeiture issues, the jury or the judge can rely both on evidence presented during the guilt-innocence phase and any additional evidence presented during the forfeiture phase.  *See* Fed. R. Crim P. 32.2(b)(1).

The standard of proof during the forfeiture phase is preponderance of the evidence because "forfeiture is part of sentencing and not an element of the offense."  Moreover, "[b]ecause forfeiture is a punishment and not an element of the offense, it does not fall within the reach of *Apprendi*."  *United States v. Cabeza*, 258 F.3d 1256, 1257 (11ᵗʰ Cir. 2001).  Thus,  the Eleventh Circuit's pre-*Apprendi* decisions "on the burden of proof in such proceedings remain good law."  *Id.* at 1257-58.

7.   Spanish speaking witnesses

The Government expects to call one or more witnesses whose native language is Spanish.  While these witnesses speak some English, their ability to speak English is limited, they speak with thick accents that makes them hard to understand at times, and are more comfortable and conversant in Spanish.  Due to

this potential barrier, the United States has secured the services of Ms. Heather L. Hayes, a Certified Federal Court Interpreter and a Certified Interpreter in the State of Alabama, to interpret for these witnesses on direct and during any cross examination.  Ms. Hayes frequently acts as an interpreter for this Court at trials and preliminary hearings.  The United States respectfully submits that the use of Ms. Hayes as an interpreter for these witnesses will substantially aid the jury in receiving and understanding their testimony.

Exhibit List

The government has provided opposing counsel with a list of proposed exhibits under separate cover.  The government will provide the Court with a list of exhibits under separate cover as well.

Respectfully submitted on this the 25th day of July, 2013.


JOYCE WHITE VANCE
United States Attorney


*/s/ Gregory R. Dimler*
GREGORY R. DIMLER
Assistant United States Attorney


*/s/ William R. Chambers, Jr.*
WILLIAM R. CHAMBERS, JR.
Assistant United States Attorney

CERTIFICATE OF SERVICE

I hereby certify that on the 25th day of July, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Mr. James W. Parkman, III
> Mr. Clayton R. Tartt
> Mr. Justin M. Taylor
> Mr. William C. White, II
> PARKMAN, ADAMS, & WHITE LLC
> 1929 3rd Avenue North, Ste. 700
> Birmingham, Alabama 35203

Respectfully submitted,

> *//s// Gregory R. Dimler*
> GREGORY R. DIMLER
> Assistant United States Attorney